UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARY MAIORIELLO,

                              Plaintiff,              1:14-CV-0214
                                                      (GTS/CFH)
v.

NEW YORK STATE OFFICE FOR PEOPLE
WITH DEVELOPMENTAL DISABILITIES,
formerly known as New York State Office of
Mental Retardation and Developmental
Disabilities; KATHERINE BISHOP, in her
Individual and Official Capacity; MAX E.
CHMURA, in his Individual and Official
Capacity; DIANA JONES RITTER, in her
Individual and Official Capacity; DAVID M.
SLINGERLAND, in his Individual and
Official Capacity; BILL MURRAY, in his
Individual and Official Capacity; LESLIE
FLUD, in her Individual and Official Capacity;
KATHY LABARGE, in her Individual and
Official Capacity; and JOHN DOE(S) and
JANE DOE(S);

                              Defendants.
_____

APPEARANCES:                                 OF COUNSEL:

BOSMAN LAW OFFICE, L.L.C.                     A.J. BOSMAN, ESQ.
  Counsel for Plaintiff
6599 Martin Street
Rome, New York 13440

HON. ERIC T. SCHNEIDERMAN                     C. HARRIS DAGUE, ESQ.
Attorney General of the State of New York     BRIAN W. MATULA, ESQ.
  Counsel for Defendants                      Assistant Attorneys General
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

<u>**DECISION and ORDER**</u>

Currently before the Court, in this retaliation action filed by Mary Maioriello ("Plaintiff") against the New York State Office for People with Developmental Disabilities ("NYS OPWDD"), Katherine Bishop, Max Chmura, Diana Ritter, David Slingerland, Bill Murray, Leslie Flud, and Kathy LaBarge (collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 84). For the reasons set forth below, Defendants' motion is granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint

Generally, liberally construed, Plaintiff's Amended Complaint alleges as follows. (Dkt. No. 34.) In April 2010, Plaintiff began her employment with NYS OPWDD as a Developmental Aide Trainee at the facility known as "O.D. Heck." (*Id.*, ¶ 10.) Her duties involved providing care to disabled clients known as "consumers" with regard to activities of daily living. (*Id.*) During her employment, Plaintiff observed NYS OPWDD staff neglecting, assaulting, and abusing consumers. (*Id.*, ¶ 11.) On October 20, 2010, Plaintiff reported the abuse to Defendant, Bill Murray, an employee of the Capital District Developmental Disabilities Services Office. (*Id.*, ¶ 14.) As a result, Plaintiff was subjected to "a campaign of retaliation and harassment that continues to the current time." (*Id.*) Specifically, Defendant Murray requested that she make four written statements regarding her observations. (*Id.*, ¶ 16.) Two days later, on October 22, 2010, Plaintiff was contacted again, and was asked to make a fifth written statement. (*Id.*) Plaintiff was then placed on paid administrative leave and was told that it was for her own "safety." (*Id.*, ¶ 17.)

While on administrative leave, and following her return, in spite of her multiple written statements, Plaintiff was called into the facility numerous times and interrogated and was repeatedly asked to recount the abuse she had witnessed to investigators. (*Id.*, ¶ 18.) On November 5, 2010, Plaintiff was allowed to return from administrative leave but was transferred from O.D. Heck to the Watervliet Facility. (*Id.*, ¶ 19.) Defendant Fuld visited Plaintiff at Watervliet and told her she was going to be "interrogated" and "grilled." (*Id.*, ¶ 20.) Thereafter, Defendants Fuld and Murray contacted Plaintiff and informed her that she was to report to O.D. Heck for another meeting where she was requested to re-enact the abuse she had witnessed involving K.C. being struck with sticks while he was forced to stay on a mat. (*Id.*, ¶ 21.) Plaintiff objected to participating in a re-enactment involving her striking Defendant Murray while being videotaped. (*Id.*) However, Defendants Murray and Fuld insisted that she participate. (*Id.*)

Due to the aforementioned events, Plaintiff became overwhelmed by the fear of retribution, retaliation, and the constant scrutiny of her employer. (*Id.*, ¶ 22.) As a result, Plaintiff suffered emotional and mental stress, culminating in her doctor placing her on a medical leave of absence on January 7, 2011. (*Id.*) During her leave of absence, Plaintiff was notified that her leave would be converted to an "unauthorized leave without pay," without insurance or benefits, beginning on March 3, 2011. (*Id.*, ¶ 23.) On March 3, 2011, Plaintiff submitted a letter of resignation due to her inability to return to the hostile and intimidating work environment and was, in effect, constructively discharged. (*Id.*, ¶ 23-24.) Even after submitting her letter of resignation, Plaintiff continued to be repeatedly summoned by Defendants for interrogation. (*Id.*, ¶ 24.) Plaintiff later learned that K.C. had been hospitalized, on or about February 28, 2011,

and later died on or about March 30, 2011, further compounding her stress and anxiety.  (*Id.*, ¶ 25.)

Based upon the foregoing allegations, the Amended Complaint sets forth the following four causes of action: (1) a claim that Defendants retaliated against Plaintiff for advocating on behalf of disabled patients, in violation of Title V of the Americans with Disabilities Act ("ADA"); (2) a claim that Defendants unlawfully interfered with, coerced, and intimidated Plaintiff, in violation of 42 U.S.C. § 12203(b) of the ADA; (3) a claim that Defendants retaliated against Plaintiff for reporting abuse of disabled patients to NYS OPWDD and police authorities in violation of the Rehabilitation Act; and (4) a claim that Defendants' retaliation was unlawful under the New York State Human Rights Law ("HRL"), New York Executive Law §§ 296(6) and 296(1).  (*Id.*, ¶¶ 29-43.)

### B.    Statement of Undisputed Material Facts

Before reciting the material facts of this case, the Court must address two issues it has identified in Plaintiff's responses to Defendants' Statement of Undisputed Material Facts, made pursuant to Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court.  First, throughout Plaintiff's Rule 7.1 Response, she "admits" many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. (*See*, *e.g.*, Dkt. No. 90, at ¶¶ 12-17, 19, 42, 55-56, 60-61, 79, 86-90, 93-95, 98, 127 [Pl.'s Rule 7.1 Response].)  Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses.  *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed

because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that Plaintiff desired to set forth additional material facts that she contends are in dispute, she was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs. *See Johnson v. City of Troy*, 14-CV-0817, 2016 WL 5107124, at *8 n.12 (N.D.N.Y. Sept. 20, 2016) (Suddaby, C.J.) ("To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.").

Second, there are several instances where Plaintiff has denied a factual assertion by citing to record evidence generally and without providing a specific or pinpoint citation to the portion of the record evidence that supports her denial. This Court's Local Rule 7.1(a)(3) requires litigants to provide a "*specific* citation to the record where the fact is established" (emphasis added). Where practical, the Court has reviewed entire exhibits that have been cited by Plaintiff

in an attempt to locate evidence that supports her asserted denials. However, the Court has not done so where Plaintiff has cited entire exhibits that are too burdensome to review in their entirety because of their length. For example, in some instances, Plaintiff cites her entire deposition transcript (which spans approximately 311 pages [Dkt. No. 90, Attach. 3]) and/or the deposition transcripts of other witnesses and/or parties without page citations. (*See*, *e.g.*, Dkt. No. 90, at ¶¶ 21, 24, 31 [Pl.'s Rule 7.1 Response].) Where this occurs, the Court will disregard Plaintiff's denials and deem Defendants' asserted facts as admitted to the extent that they are supported by admissible record evidence. *See Clark v. N.Y.S. Office of the State Comptroller*, 09-CV-0716, 2014 WL 823289, at *1, n.8 (N.D.N.Y. Mar. 3, 2014) (Sharpe, J.) ("While Clark responded, . . . she did not do so in compliance with Local Rule 7.1(a)(3). For instance, many of Clark's denials do not, as Rule 7.[1][a][3] requires, set forth a specific citation to the record where the factual issue arises, but instead accompany an instruction to 'see record evidence' or 'see total record evidence,' contain no citation whatsoever, or generally cite an entire document–often, an entire deposition transcript."); *Wang v. Swain*, 09-CV-0306, 2011 WL 887815, at *1 (N.D.N.Y. Mar. 14, 2011) (McAvoy, J.) ("[A] simple citation to an 'exhibit' consisting of numerous documents, or citation to a deposition without a pinpoint citation to where in the deposition support for the denial is contained, is insufficient."); *Bronner v. Catholic Charities of Roman Catholic Diocese of Syracuse, Inc.*, 08-CV-0015, 2010 WL 981959, at *1 (N.D.N.Y. Mar. 15, 2010) (McAvoy, J.) ("Plaintiff simply cites to the documents generally, i.e., a simple cite to the exhibit number, and in many instances, cites to numerous exhibits to support a single proposition. Apparently, Plaintiff or his attorneys expect the Court to wade through the mass of paper to find whether or not the 'cite' supports a proposition made by Plaintiff. . . .").

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts ("Rule 7.1 Statement") and expressly admitted by Plaintiff in her response thereto ("Rule 7.1 Response") or denied without any record citation.

### 1. Party Background and Pre-Investigation Matters

1.      OPWDD is the New York State agency responsible for coordinating services for more than 128,000 New Yorkers with developmental disabilities.

2.      The agency provides services directly, through its administration of various state run services, and indirectly, through its regulatory oversight of nonprofit agencies.

3.      From 2010 to 2011, OPWDD was organized to include 13 Developmental Disabilities Services Offices ("DDSO") in different regions throughout the state.

4.      These DDSOs oversaw operations of state-run and voluntary facilities within the respective DDSO.

5.      One of the 13 DDSOs was Capital District DDSO.

6.      One of the state operated facilities within Capital District DDSO's oversight was the Oswald D. Heck ("O.D. Heck") facility located on Consaul Road in Schenectady, NY.

7.      O.D. Heck included, among other available services, a Campus Based Intermediate Care Facility ("ICF") where 48 individuals with developmental disabilities resided and were provided 24-hour/day care.

8.      Care and treatment for individuals in the residential treatment program were provided by a host of different staff including, among others, Developmental Aides ("DA"), Nursing, Psychological, Therapeutic, and Medical staff.

9.     Plaintiff was employed by OPWDD as a Developmental Aide Trainee ("DAT") beginning in or about May of 2010.

10.     As a newly hired DAT, she was a probationary employee.

11.     A probationary employee is not a permanent employee until he/she is able to complete his/her probationary period.

12.     Probationary employees do not enjoy the full range of benefits that their union negotiated for them.  For example, they do not qualify for the protections of the disciplinary process under the collective bargaining agreement.

13.     Upon being hired, Plaintiff was assigned to the O.D. Heck facility.

14.     DAs and DATs are tasked with providing direct support, care and assistance with activities of daily living to people who reside in OPWDD facilities.

15.     DAs and DATs are mandated reporters of abuse and neglect against individuals with developmental disabilities within the agency's care.

16.     To this end, they have an employment obligation to report allegations of suspected abuse or neglect "as soon as possible."

17.     The timely reporting of abuse or neglect is a critical responsibility for DAs and DATs for a multitude of reasons, including that it puts a stop to the abuse as quickly as possible to protect individuals from further harm, and it allows for the collection of physical evidence that can disappear or diminish if not promptly discovered.

18.     The failure to timely report allegations of abuse or neglect against individuals with developmental disabilities is a major violation of OPWDD rules that mandate the reporting of abuse.

19.     Plaintiff was aware of her duties as a mandated reporter and received training on the implications of this status, including her obligation to report events of abuse and neglect she observed.

20.     Additionally, Plaintiff was aware that failing to report abuse or neglect of residents in a timely manner was an offense for which she could be terminated.

21.     Plaintiff claims to have witnessed OPWDD staff committing acts of physical, mental and emotional abuse toward three individuals with developmental disabilities at O.D. Heck beginning in the summer of 2010.

22.     Despite allegedly observing acts of abuse and neglect for months, Plaintiff concedes that she did not initiate the report of the alleged abuse to anyone at OPWDD.[1]

23.     In fact, Plaintiff concedes that she described the alleged abuse only after being contacted by agency investigators who discovered the allegations by other means.[2]

24.     Because Plaintiff did not report the abuse or neglect she claims to have witnessed in the summer of 2010 to OPWDD, the agency did not become aware of the allegations until sometime in late October of 2010.

25.     The way the agency initially discovered the allegations of abuse and neglect took a convoluted route, which could have been avoided had Plaintiff complied with her obligation to

---

[1]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 22 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 22 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[2]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 23 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 23 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

immediately report directly to her employer.[3]

26.     The indirect route for the reporting was as follows: At some point in time, Plaintiff told her mother, a non-OPWDD employee, about one incident of abuse that she allegedly witnessed involving OPWDD employees throwing French fries on the floor and making individuals with developmental disabilities fetch the food.[4]

27.     Subsequently, her mother told a friend, also a non-OPWDD employee, about Plaintiff's accusations.

28.     Thereafter, Plaintiff's mother's friend told one of her own friends, a woman named Sharon Feldman, about the allegations.

29.     Plaintiff's mother's friend's friend, Sharon Feldman, was an OPWDD employee.

30.     Ms. Feldman reported the information to OPWDD on October 19, 2010.

31.     Ms. Feldman's reporting prompted the immediate commencement of an investigation by OPWDD on or about October 20, 2010.

### 2.     OPWDD's Investigation Process Generally

32.     OPWDD is mandated by law to ensure that all allegations of abuse or neglect against individuals with developmental disabilities in the agency's care are thoroughly

---

[3]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 25 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 25 [Pl.'s Rule 7.1 Response, denying above-stated fact but citing record evidence that only supports her assertion that she witnessed OPWDD employees mistreat the consumer K.C., which fails to refute the above-stated fact].)

[4]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 26 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 26 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence in support of denial, and "admit[ting]" factual assertions not made by Defendants in the above-stated fact, which will not be considered].)

investigated.[5]

33.     The "form and format" of OPWDD investigations are specified by OPWDD itself and not dictated by state law or regulation.

34.     The Capital District DDSO has adopted a policy regarding investigation procedures to be employed for investigations of "abuse of consumers."[6]

35.     Moreover, "[a] thorough investigation includes at a minimum: the collection of all interviews, statements, physical evidence and any maps, pictures, or diagrams; review of all information, resolution of any discrepancies; summary of conclusions; and recommendations for action to safeguard all individuals during and after completion of the report."[7]

36.     As per OPWDD policy and federal regulation, OPWDD investigators employ standard investigatory techniques, such as witness statement taking, witness/subject interviews and interrogations, physical and documentary evidence collection, photography, and where

---

[5]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 32 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 32 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence in support of denial].)  Specifically, in support of her denial, Plaintiff cites "EXB Q" but an Exhibit "Q" is not included in Plaintiff's exhibits (*see generally* Dkt. No. 89, Attach. 1).

[6]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 34 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 34 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence in support of denial].)  Specifically, Plaintiff denies the above-stated fact on the basis that, among other things, Defendants did not employ reliable investigation procedures or that Defendant Murray is qualified to conduct investigations that "are based upon any standard in the profession of investigations." However, this is irrelevant to the general proposition of whether the Capital District DDSO has adopted a policy regarding investigation procedures.

[7]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 35 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 35 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence in support of denial].)  Specifically, Plaintiff's denial is once again based on arguments that are irrelevant to whether the above quoted language from 42 CFR § 483.420 is accurate and/or valid.

warranted, videotaped re-enactments.[8]

37.     During the time period at issue, all investigations culminated in the completion of a formal report, which included a synopsis of salient evidence, factual findings, analysis, conclusions, and recommendations, to which relevant materials relied upon would be attached.[9]

38.     Along with the collection of documentary and physical evidence, the acquisition of written statements from witnesses or other interested persons is the primary tool utilized by OPWDD investigators.[10]

39.     Statements are generally obtained following informal interviews of witnesses; with follow-up statements obtained as necessary, based upon the severity or complexity of the

_____

[8]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 36 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 36 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence in support of denial].)  Once again, Plaintiff's denial is based on arguments targeting Defendant Murray's qualifications as an investigator and whether OPWDD employed reliable investigation procedures, which are irrelevant to whether OPWDD did in fact have a policy in place during the relevant time period as described in the above-stated fact.

[9]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 37 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 37 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence in support of denial].)  Specifically, Plaintiff fails to cite record evidence that supports her assertion that all investigations did not include a synopsis of salient evidence.  Plaintiff's remaining arguments do not actually refute the above-stated fact because they focus on the reliability of the investigations, which are based on Plaintiff's assertion that Defendant Murray was not qualified as an investigator.  This is irrelevant as to whether, *inter alia*, "all investigations culminated in the completion of a formal report."

[10]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 38 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 38 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Specifically, Plaintiff's arguments do not actually refute the above-stated fact because they focus on the reliability of the investigations, which are based on Plaintiff's assertion that Defendant Murray was not qualified as an investigator.  This is irrelevant as to whether "the acquisition of written statements from witnesses or other interested persons is the primary tool utilized by OPWDD investigators."

investigation.[11]

40.     OPWDD investigators may conduct interviews, interrogations or both in the course of their investigations.

41.     The terms interview and interrogation are largely interchangeable, insofar as both involve the questioning of an interested person during the course of an investigation.[12]

42.     The difference between the two terms is essentially one of terminology born from the collective bargaining agreement ("CBA").

43.     Pursuant to the CBA between the Civil Service Employees Association, Inc. ("CSEA"), and New York State, an "interrogation" is defined as the "questioning of an employee who, at the time of such questioning appears to be a likely or potential target or subject for disciplinary action."

44.     Employees to be interrogated have the option of having union representation present for their questioning by investigators.

---

[11]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 39 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 39 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Specifically, Plaintiff fails to cite record evidence that supports her assertion that investigations did not include necessary follow-up statements.  Plaintiff's remaining arguments do not actually refute the above-stated fact because they focus on the reliability of the investigations, which are based on Plaintiff's assertion that Defendant Murray was not qualified as an investigator.  This is irrelevant as to whether "[s]tatements are generally obtained following informal interviews of witnesses; with follow-up statements obtained as necessary," etc.

[12]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 41 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 41 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Specifically, Plaintiff has cited record evidence demonstrating that there are differences in meaning between the two terms.  However, the above-stated fact states that these terms are largely interchangeable *to the extent that both involve the questioning of an interested person*, which Plaintiff has not refuted with admissible record evidence.

45.     While the nomenclature may differ, there is no substantive difference between the questioning interposed in an interview as compared to an interrogation, i.e., neither is more or less adversarial, combative, or inquisitorial than the other.[13]

46.     The disciplinary process provisions contained in Article 33 of the CBA do not apply to DATs, as they are probationary, non-permanent employees.

47.     Thus, when DATs are interviewed as potential targets of administrative action, they are not entitled to have union representation present and, therefore, are not technically being "interrogated" as that definition applies to permanent union employees only.

48.     In other words, probationary DATs can be questioned at any time as potential targets of administrative action without any of the protections afforded under the CBA's disciplinary process provisions, such as Article 33 of the CBA.

49.     Out of an abundance of caution, however, during the relevant time period DATs interviewed and/or interrogated in the course of investigations were regularly offered the right to have union representation, even though this was not required.

50.     While not undertaken in every investigation, OPWDD investigators occasionally employ videotaped re-enactments as one of their investigatory tools.

51.     The re-enactment allows the investigator to see a demonstration of alleged abuse/neglect, in order to test its feasibility, veracity or credibility.[14]

---

[13]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 45 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 45 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite any record evidence supporting denial of above-stated fact].)

[14]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 51 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 51 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite any record evidence supporting denial of above-stated fact].)

52.     The re-enactment tool is employed most commonly in more serious cases, or cases where a visual depiction of events is both possible and helpful.

53.     Generally, administrative leave is a non-punitive employment status utilized at the discretion of OPWDD management for a variety of different reasons.

54.     Administrative leave is routinely utilized during the course of investigations.

55.     The status is generally applied to remove employees suspected of wrong doing from further interactions with individuals with developmental disabilities until the completion of an investigation.

56.     Administrative leave can also be utilized to do the following: (a) cordon off employees potentially involved in an incident from one another during the pendency of an investigation in order to maintain the purity of evidence, (b) protect employees from retaliation, or (c) give the agency an opportunity to conduct an initial review of the situation.

57.     At the O.D. Heck facility in 2010, an employee's placement on administrative leave would be at the discretion of the facility's director.

58.     Employees placed on administrative leave receive full pay and benefits during the pendency of their leave.

### 3.     Plaintiff's Role in Investigations

59.     Following Sharon Feldman's reporting of abuse and neglect on October 19, 2010, Capital District DDSO initiated investigations into the allegations of abuse and neglect allegedly witnessed by Plaintiff during the summer and fall of 2010.

60.     The investigations were comprised of the standard elements of most OPWDD investigations, as set forth above, and Plaintiff's involvement throughout was consistent with

that of a primary witness, insofar as she was interviewed, provided written statements, interviewed/interrogated and provided a videotaped re-enactment display of her allegations.

61. Plaintiff alleges through this lawsuit that the number of times she was interviewed and asked to give statements was retaliatory.

62. The reason Plaintiff was interviewed multiple times and asked to provide several written statements throughout the investigation was that her initial interview about one reported incident of abuse spurred multiple other investigations into different allegations of abuse against a variety of targets.[15]

63. That is, upon approaching Plaintiff after the initial report by Sharon Feldman regarding the "French fry incident," Plaintiff disclosed having knowledge of multiple other incidents about which she had failed to immediately report.[16]

64. Thus the initial report by Sharon Feldman about the "French fry" incident ultimately resulted in OPWDD's initiation of seven (7) separate investigations against ten (10) different OPWDD employees, all of which involved Plaintiff as the primary eye-witness.

_____

[15]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 62 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 62 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[16]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 63 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 63 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  The Court notes that Plaintiff acknowledges that it was Sharon Feldman who first reported what Plaintiff had allegedly witnessed to OPWDD, rather than Plaintiff herself (*see* Dkt. No. 90, ¶¶ 27-30; Dkt. No. 90, Attach. 9, at 31:13-19), and that she told Defendant Murray about other incidents of abuse only after he had called her into his office to discuss the "French fry incident" that Ms. Feldman had reported (Dkt. No. 90, Attach. 9, at 31:20-32:5; Dkt. No. 90, Attach. 1, ¶ 8).

65.     Analysis of Plaintiff's specific role in these seven (7) investigations demonstrates

that her role was consistent with that of any other primary eye-witness and was in-line with

OPWDD's standard investigatory protocol.[17]

> (a) Investigation #1 (84-A-2010): Plaintiff was interviewed on October 20, 2010, and October 22, 2010, and asked to provide a written statement on October 20, 2010, during her interview.

> (b) Investigation #2 (85-A-2010): Plaintiff was interviewed on October 20, 2010, and October 22, 2010, and asked to provide a written statement on October 20, 2010, during her interview.  Due to the severity of the allegations of abuse raised in this investigation, Plaintiff was asked to conduct a videotaped re-enactment of the alleged abuse witnessed on December 13, 2010, and formally interviewed/interrogated on January 5, 2011.

> (c) Investigation #3 (86-A-2010): Plaintiff was interviewed on October 20, 2010, October 22, 2010, and November 3, 2010, she did not provide a separate written statement for this investigation; instead, the same statement from Investigation #2 was used.  The video re-enactment on December 13, 2010, and formal interview/interrogation on January 5, 2011, were also utilized for this investigation, as the allegations between Investigations #2 and #3 were similar.

> (d) Investigation #4 (87-A-2010): Plaintiff was interviewed on October 20, 2010, and October 22, 2010, and asked to provide a written statement on October 22, 2010, during her interview.

> (e) Investigation #5 (88-A-2010): Plaintiff was interviewed on October 20, 2010, and October 22, 2010, and asked to provide a written statement on October 22, 2010, during her interview.

> (f) Investigation #6 (90-A-2010): Plaintiff was interviewed on October 22, 2010, and November 5, 2010, and asked to provide a written statement on October 22, 2010, during her interview.

> (g) Investigation #7 (91-A-2010): Plaintiff was interviewed on October 22, 2010, and asked to provide a written statement on October 22, 2010, during her interview.

---

[17]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 65 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 65 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

66.     As referenced above in Investigations #2 and #3, on January 5, 2011, Plaintiff was formally interviewed/interrogated by OPWDD investigators, William Murray and Leslie Fuld.[18]

67.     As was standard protocol, Capital District DDSO Director of Labor Relations, Cathy LaBarge, was also present for this interview/interrogation.[19]

68.     Because Plaintiff was still a probationary employee, she was not entitled to the formal protections for interrogations under the CBA, i.e., audio recording of the session and union representation.

69.     Despite not being required to do so, O.D. Heck's Labor Relations staff sought union representation for Plaintiff for the interview/interrogation and, when it was determined that no union representative was available, they offered to reschedule the session for a time when Plaintiff could be represented.[20]

---

[18]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 67 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 67 [Pl.'s Rule 7.1 Response, admitting above-stated fact then denying it but failing to cite record evidence actually supporting denial of above-stated fact].)

[19]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 68 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 68 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[20]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 70 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 70 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Specifically, Plaintiff admits that Defendants were not required to accommodate her with union representation but denies that such an accommodation was offered out of a concern for her. In support of this denial, Plaintiff refers the Court to her response in Paragraph 69. However, Plaintiff simply stated "Admit" in response to that factual assertion. Therefore, the Court will deem this factual assertion admitted as well.

-18-

70.     This was done because O.D. Heck's Labor Relations staff found the extra protection for employees, even if probationary, was the best practice.[21]

71.     The January 5, 2011, session was called an "interview/interrogation" because, as discussed above, as a DAT, Plaintiff was not actually entitled to the formalized CBA interrogation process.  However, because Plaintiff failed to report multiple allegations of abuse and neglect immediately, she was a potential target for administrative action as well as a primary witness.[22]

### 4.     Plaintiff's Placement on Administrative Leave and Reassignment

72.     Accordingly, the investigators attempted to afford her the rights of an interrogation, despite not having any obligation to do so.

73.     On or about October 22, 2010, shortly after commencement of various investigations into allegations of abuse and neglect, Plaintiff, along with other OPWDD employees involved in those investigations, were placed on paid administrative leave.

74.     The decision to place Plaintiff on administrative leave was made by Katherine Bishop, the Director of Capital District DDSO.

--------

[21]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 71 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 71 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[22]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 72 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 72 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Specifically, Plaintiff disputes that she failed to report allegations of abuse and neglect.  However, the above-stated fact indicates that Plaintiff failed to report these allegations *immediately*.  The remaining portion of Plaintiff's denial calls for improper speculation and is not supported by the record evidence that she cites.

75.     The basis for Plaintiff's placement on paid administrative leave was multi-faceted including, among other things, (1) to protect her safety and anonymity among her colleagues in light of the numerous allegations she disclosed upon interview by the investigative staff, (2) to protect the purity of the evidence so that her continued work with her peers during the investigation did not affect her as a witness, and (3) to sanction her for failing to immediately report allegations of abuse that she was required to report as a mandated reporter and employee of OPWDD.[23]

76.     Plaintiff returned from administrative leave status on November 4, 2010.

77.     Plaintiff returned to an alternate work site within Capital District DDSO where any discussion of the investigations that were currently ongoing by co-workers at O.D. Heck would be minimized and where her role as a witness would be protected.

78.     Re-training related to Plaintiff's duty to report allegations of abuse and neglect was scheduled and took place after her return to work on December 13, 2010.[24]

---

[23]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 76 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 76 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[24]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 79 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 79 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Specifically, Plaintiff claims that she did not receive training but was required to demonstrate the abuse that she witnessed through a re-enactment that was videotaped and then handed a document to sign indicating that she had received a memo on reporting abuse.  However, Plaintiff cites "Pltf's Affm; EXB" in support of this assertion. Despite the lack of a specific citation (including any citation to the specific exhibit she refers to), the Court has read through the entirety of Plaintiff's affirmation and has not found anything that supports her denial.  In fact, Paragraph 14 of Plaintiff's affirmation describes the re-enactment she was allegedly forced to participate in but, according to the affirmation, this occurred on 12/15/10 and not on 12/13/10, as asserted in the above-stated fact.  Nor does this

79.     Upon return from administrative leave, Plaintiff was reassigned to an alternate work location: the Boght Road Individualized Residential Alternative ("Boght Road IRA") in Watervliet, NY.

80.     The decision to reassign Plaintiff to Boght Road IRA was made by the Director of O.D. Heck, Kate Bishop.[25]

81.     The reason for the reassignment was to (1) maintain Plaintiff as an unbiased witness, and (2) to protect her from potential negative interactions with other DAs at O.D. Heck who were either involved in or potentially loyal to the staff members that were the targets of the investigations.[26]

82.     Plaintiff was told that the reassignment was for her own protection and given a choice of transfer facilities.

83.     Neither Plaintiff's placement on paid administrative leave nor her reassignment to Boght Road IRA was done for punitive or retaliatory reasons.[27]

_____

paragraph make any mention of Plaintiff having received a memo on abuse reporting. Therefore, this fact will be deemed admitted.

[25]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 81 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 81 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[26]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 82 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 82 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite any record evidence supporting denial of above-stated fact].)

[27]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 84 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 84 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite any record evidence supporting denial of above-stated fact].)

84.     Both acts were undertaken to protect Plaintiff's safety and anonymity amongst her colleagues at O.D. Heck, as she was the primary witness to investigations involving a number of other employees, and in an attempt to shield the evidence from outside influence or bias.[28]

### 5.     Plaintiff's Resignation

85.     Consistent with the New York Department of Civil Service Attendance and Leave manual, OPWDD requires medical documentation for absences of five or more consecutive workdays due to personal or family illness.[29]

86.     In the case of extended illness, OPWDD policy dictates that "medical certificates may need to be provided each month."

87.     Where an employee "does not produce the required certifications . . . [t]he absence may then be charged to other appropriate credits or may be considered as authorized or unauthorized leave without pay."[30]

---

[28]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 85 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 85 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite any record evidence supporting denial of above-stated fact].)

[29]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 86 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 86 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  Plaintiff seeks to include the additional fact that OPWDD's leave policy exempts "absences covered by the Workers Compensation Law." However, this is an additional fact and does not actually refute the above-stated fact.

[30]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 88 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 88 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

88.     Plaintiff worked at the Boght Road IRA from November 4, 2010, until approximately January 7, 2011, when she ceased coming to work.

89.     On or about January 7, 2011, Plaintiff reported to OPWDD's Human Resources staff that she was out of work on "extended medical leave."

90.     Accordingly, on January 7, 2011, Plaintiff was placed on "Medical Leave" by OPWDD.

91.     By letter dated January 7, 2011, OPWDD notified Plaintiff of her placement on "Medical Leave" and provided her with instructions regarding how to maintain authorized medical leave status.  To wit, the January 7, 2011, letter stated as follows:

> Please have your physician completed the enclosed 'Employee Medical Certificate' and return it to the Personnel Office by January 16, 2011, **medical documentation is required every 30 days when you are on an extended leave of absence.  Failure to provide medical documentation will result in your absence being unauthorized and you will be removed from the payroll.  This could include retroactive absences**.

> Additionally, medical documentation must be provided to the Personnel Office prior to your return to work.  Appropriate medical documentation must include the date of return to work with no restrictions or if restrictions apply specifically noted what the restrictions are.

92.     On or about January 24, 2011, Plaintiff provided OPWDD with the requested "Employee Medical Certificate."

93.     The form, signed by Plaintiff's Psychiatrist, Dr. Peeyush Mittal, states that Plaintiff should remain "off work 1/6/11-1/20/11."

94.     Plaintiff did not return to work after January 20, 2011.

95.     Instead, on or about January 26, 2011, Plaintiff provided OPWDD with a "Certificate for Return to School or Work," also from Dr. Peeyush Mittal.[31]

96.     This documentation provided that Plaintiff was "able to return to work on February 2, 2011."[32]

97.     Plaintiff, however, did not return to work on this date either.

98.     On February 7, 2011, OPWDD notified Plaintiff by letter that her medical documentation relevant to her continued leave had expired and that "new medical is required to maintain your leave as an authorized leave."

99.     Plaintiff was given until February 15, 2011, to provide new medical documentation to support her continued leave, or risk having her leave transformed to "unauthorized leave without pay."

100.    Staff in the Human Resources Department at the Capital District DDSO also called Plaintiff and left her a message on February 7, 2011.

---

[31]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 96 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 96 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Specifically, Plaintiff disputes the date of the letter provided by Dr. Mittal. Although Dr. Mittal dated the letter 1/24/11, the date stamped by facsimile is 1/26/11. Therefore, the Court will utilize the date that Defendants received the letter, which is 1/26/11. Plaintiff further disputes "the implication that simply because her doctor wrote a note continuing her medical leave after January 20, 2011, it warranted any punitive and retaliatory action against Plaintiff." Plaintiff's argument is not supported by citation to admissible record evidence and is an otherwise improper basis for controverting the above-stated fact.

[32]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 97 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 97 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

101.    The following day, on February 8, 2011, OPWDD notified Plaintiff by letter that her "accruals will exhaust on February 18, 2011," resulting in her placement on "sick leave without pay on February 19, 2011."

102.    This letter also notified Plaintiff that "when you are placed on leave without pay this could affect your health insurance coverage," and provided Plaintiff with information on continuing health coverage while on leave without pay.

103.    An accrual is leave time (vacation, personal or sick) accumulated by a State employee based upon a formula set forth under the New York Civil Service Law.

104.    Accruals are not limitless; they are accumulated and can be exhausted if used before further accumulation.

105.    On or about February 11, 2011, Plaintiff's chiropractor, Paul Lewandowski, sent OPWDD an "Employee Medical Certificate" via facsimile.

106.    The certificate states that the cause of the injury was "unknown–no specific injury" and that Plaintiff is able to return to work on February 17, 2011, with restrictions of "low stress environment, limited activity."

107.    OPWDD sent Plaintiff paperwork necessary to seek an employment accommodation on February 11, 2011.

108.    Plaintiff's human resources file does not reflect that this paperwork was ever completed and returned to OPWDD.

109.    Plaintiff did not return to work on February 17, 2011.

110.    On February 17, 2011, staff from O.D. Heck's Human Resources Department left Plaintiff a telephone message regarding her need to update her medical certification.

111.    On February 19, 2011, Plaintiff was placed on sick-leave-without-pay status because she had exhausted all of her accrued leave time.

112.    On February 22, 2011, OPWDD notified Plaintiff by letter that her medical documentation relevant to her continued leave had expired and that "new medical is required to maintain your leave as an authorized leave."

113.    Plaintiff was given until March 3, 2011, to provide new medical documentation to support her continued leave or risk having her leave transformed to "unauthorized leave without pay."

114.    On February 24, 2011, staff from Capital District DDSO's Human Resources Department left Plaintiff a telephone message.

115.    On March 3, 2011, OPWDD sent Plaintiff a letter stating the following:

> Per my letter dated February 22, 2011, . . . you have been continuously absent from work on an extended medical leave since January 7, 2011, to date, updated medical documentation has not been received.  As a result, your absence is considered to be unauthorized leave without pay, effective March 3, 2011.

116.    Unauthorized leave generally results in termination of the employee based upon the unauthorized nature of his or her absences.[33]

---

[33]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 119 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 119 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact and asserting without justification that Defendants' record evidence is inadmissible].) Specifically, Plaintiff objects to the above-stated fact as improper hearsay without providing any reasons in support of her objection.  The above-stated fact is supported by the declaration of Jeremiah Coleman, who is the Regional Director for Workforce and Talent Management at the Capital District DDSO.  (Dkt. No. 84, Attach. 7, ¶ 1 [Coleman Decl.].)  As part of his job duties in this position, Mr. Coleman oversees human resources, training, and labor relations for OPWDD.  (*Id.*)  Accordingly, it is apparent that the above-stated fact is based upon what Mr. Coleman has personally observed in similar cases as Regional Director and, therefore, is not inadmissible hearsay.

117.    OPWDD cannot continue to pay or provide benefits to employees who do not

attend work nor provide documentation to justify their absence.[34]

118.    Similarly, state funded employee medical insurance coverage and other benefits

lapse upon an employee's placement on unauthorized leave.[35]

119.    Like an employee's salary, where the employee does not attend work, provide

required medical justification for his or her absence, and has no accruals left to continue his or

her paid employment, the State does not continue to pay for medical benefits.[36]

120.    As set forth in the Employee Handbook in Section 8.8,

> Unless you are covered under [FMLA] or Workers' Compensation
> Leave, you [employee] are responsible for paying the entire cost
> (State share and employee share) of your individual or family
> coverage if you wish to continue your health insurance coverage

---

[34]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 120 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 120 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Plaintiff seeks to include the fact that "an employee who is absent from work due to a work-related injury is entitled to Workers Compensation benefits which are not drawn from the employee's accruals." However, this does not refute the above-stated fact and, in any event, Defendants acknowledge that employees will continue to receive benefits if they are covered under the FMLA or Workers' Compensation Leave (Dkt. No. 84, Attach. 1, ¶ 123).

[35]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 121 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 121 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Plaintiff seeks to include the fact that an employee will continue to receive benefits that are on Workers' Compensation leave. However, this does not refute the above-stated fact because an employee's leave would be authorized if they are on Workers' Compensation leave. In any event, Defendants acknowledge that employees will continue to receive benefits if they are covered under the FMLA or Workers' Compensation Leave (Dkt. No. 84, Attach. 1, ¶ 123).

[36]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 122 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 122 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

during periods of leave without pay.[37]

121.    On March 3, 2011, staff from OPWDD's Human Resources Department left Plaintiff a telephone voice message.

122.    On March 11, 2011, OPWDD provided Plaintiff a letter explaining that, due to her absence from her position for more than 60 days, the job assignment she held when her leave began was eligible to be posted on April 8, 2011, i.e., 90 days after her leave started on January 7, 2011.

123.    The CBA allows for positions to be posted after an employee has been absent from work for 90 days.  However, pursuant to OPWDD's policy at the time, OPWDD sends notification to the employee on the 60th day to notify him or her that his or her current assignment may be posted.[38]

124.    On March 15, 2011, Plaintiff resigned her position with OPWDD.

---

[37]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 123 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 123 [Pl.'s Rule 7.1 Response, admitting part of above-stated fact and denying part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[38]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 126 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 126 [Pl.'s Rule 7.1 Response, asserting without justification that Defendants' record evidence is inadmissible].)  Plaintiff argues that a letter sent to her notifying her that her current position may be posted is hearsay.  However, this letter (Dkt. No. 84, Attach. 8, at 35) was not cited or referenced in the above-stated fact.  In any event, even if it were, the letter is not hearsay if it was offered to prove that Plaintiff received notice of the possibility that her position could be posted.  *See Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011) ("Out-of-court statements are also not considered hearsay if used to prove notice or knowledge.").  Moreover, the above-stated fact is supported by Mr. Coleman's personal knowledge of the relevant policy due to his position as Regional Director that oversees, *inter alia*, OPWDD's Human Resources (Dkt. No. 84, Attach. 7, ¶ 1 [Coleman Decl.].)  *See Ciaprazi v. Jacobson*, 13-CV-4813, 2016 WL 4619267, at *4 (S.D.N.Y. Sept. 6, 2016) (finding a witness's statements regarding dental policies at the New York State Department of Corrections and Community Supervision not to be hearsay because the statements were based on personal knowledge that came from her job responsibilities as "Dental Director").

###### 6.    Personal Involvement

125.    Defendant Diana Jones Ritter served as OPWDD's Commissioner from March 14, 2007, until July 17, 2010, at which time she resigned and left the agency.

126.    She never met Plaintiff during her tenure at OPWDD and had left the agency more than three months before the seven (7) O.D. Heck investigations had even commenced.[39]

127.    In any event, Defendant Ritter, in her role as Commissioner, would not have been personally involved in any O.D. Heck investigations.[40]

128.    Defendant Ritter first learned of the seven (7) investigations in question through this lawsuit and did not have personal knowledge or information regarding Plaintiff or the investigations at issue.[41]

129.    David Slingerland served as the Director of the Capital District DDSO, which included the O.D. Heck facility, from December 7, 2005, until August 24, 2010.

---

[39]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 132 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 132 [Pl.'s Rule 7.1 Response, admitting above-stated fact and then denying it but failing to cite record evidence actually supporting denial of above-stated fact].) Specifically, Plaintiff disputes whether Defendant Ritter had any involvement in this matter based on her position as commissioner and the fact that she was responsible for establishing and enforcing policies. However, the above-stated fact does not make any assertion regarding Defendant Ritter's involvement in Plaintiff's allegations of abuse.

[40]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 133 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 133 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[41]    (*Compare* Dkt. No. 84, Attach. 1, ¶ 134 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 134 [Pl.'s Rule 7.1 Response, admitting above-stated fact and then denying it but failing to cite record evidence actually supporting denial of above-stated fact].)

130. Mr. Slingerland's last work day with the agency was August 24, 2010, when he left and used accruals until his formal retirement, which was on either September 20th or 30th of 2011.

131. Mr. Slingerland does not recall ever having met Plaintiff during his tenure with O.D. Heck, and had retired from the agency over one month before the seven (7) investigations had even commenced.[42]

132. Mr. Slingerland was not involved in any manner with any element of the investigations that started after he left state service.[43]

133. Max Chmura served as OPWDD's Acting Commissioner from July of 2010 until March 31, 2011, at which time he retired and left the agency.

134. While he formally retired on March 31, 2011, Mr. Chmura actually left the agency in mid-February of 2011, at which time he ceased all duties as Acting Commissioner.

135. Mr. Chmura never met Plaintiff during his tenure at OPWDD.

136. As Acting Commissioner, he had no personal role in any O.D. Heck investigations.[44]

---

[42]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 137 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 137 [Pl.'s Rule 7.1 Response, admitting above-stated fact and then denying it but failing to cite record evidence actually supporting denial of above-stated fact].)

[43]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 138 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 138 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[44]     (*Compare* Dkt. No. 84, Attach. 1, ¶ 142 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 90, at ¶ 142 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

137.     O.D. Heck was a facility under the direct management of the Capital District DDSO.

138.     During the 2010-2011 time frame, OPWDD had 13 different DDSOs, each with multiple state-run and voluntarily operated facilities under their control.

139.     Although Mr. Chmura was responsible for the overall operation of the agency as the Acting Commissioner, the day-to-day operations of facilities within a DDSO, including investigations, were run by the DDSO's staff and supervisors and not the agency's Commissioner.

140.     In other words, Mr. Chmura did not have any personal involvement or supervisory oversight involvement with any investigation of Plaintiff, at any time.

**C.     The Parties' Briefing on Defendants' Motion**

**1.     Defendants' Memorandum of Law**

Generally, in their memorandum of law, Defendants assert four arguments.  (Dkt. No. 84, Attach. 2 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff's claims are barred by the three-year statute of limitations period and that the continuing-violation doctrine does not apply.  (*Id.* at 5.)[45]  As an initial matter, the Court notes that it held in its Decision and Order of September 30, 2015, that (1) the applicable limitations period in this matter runs from February 27, 2011, to February 27, 2014, and (2) the only alleged act that occurred inside the limitations period was OPWDD's failure, between February 27, 2011, and March 3, 2011, to withdraw its demand that Plaintiff return to work or she would have to begin paying for medical coverage that OPWDD afforded

---

[45]     Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the parties' respective motion papers.

her pursuant to her employment. (Dkt. No. 32, at 20.) In so ruling, this Court noted that, because it was considering Defendants' arguments under the standard governing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it could not consider evidence (which had not been adduced) such as (1) the fact that conversion of Plaintiff's paid leave to unpaid leave on March 3, 2011, was pursuant to a policy (specifically, a policy that OPWDD does not pay its employees indefinitely while they are on leave but only for a certain period due to cost), and (2) the fact that the medical coverage afforded to OPWDD's employees is not "exhausted" (or terminated) while they are on leave (and, rather, is "exhausted" only upon their separation of employed from the OPWDD), and that, when employees are on unpaid leave, they themselves must pay for that medical coverage, pursuant to a policy or legal requirement. (Dkt. No. 84, Attach. 2, at 21.)

Based upon these rulings, which Defendants argue are now "the law of the case," Defendants argue that OPWDD's refusal (between February 27, 2011, and March 3, 2011) to withdraw its demand that Plaintiff return to work on March 3, 2011, or she would have to begin paying for her own medical coverage cannot be relied upon to invoke the continuing-violation doctrine. (*Id.* at 6-7.) Specifically, Defendants argue that the aforementioned refusal was non-retaliatory and motivated solely by the requirement that OPWDD comply with well established policy. (*Id.* at 6.) With respect to the two other facts referenced by the Court, Defendants argue that OPWDD and Civil Service policy dictate that employees on extended leave, who fail to provide timely medical justification for their leave and who exhaust their accrued time off, are not paid indefinitely and do not receive unlimited state-funded medical benefits. (*Id.* at 7.) Accordingly, Defendants argue that, because Plaintiff failed to provide the requested medical certifications justifying her continued absence from work beyond February 17, 2011, and

because she exhausted her accrued time off, she was converted to unauthorized leave without pay and her medical benefits ceased. (*Id.* at 7-10.)

Second, Defendants argue that Plaintiff's retaliation claims under the ADA, Title V, Rehabilitation Act § 504, and NYSHRL fail as a matter of law under the *McDonnell Douglas* burden-shifting framework. Specifically, Defendants argue that Plaintiff did not engage in a protected activity when she reported allegations of abuse and neglect against individuals with disabilities because, as a DAT at O.D. Heck, she was a mandated reporter and was required, as part of her job duties, to report such abuse. (*Id.* at 12-13.) In addition, Defendants argue that Plaintiff failed to voluntarily report the abuse she allegedly witnessed and disclosed the allegations only after being contacted by agency investigators. (*Id.* at 14.) Similarly, Defendants argue that, because Plaintiff did not engage in a protected activity, OPWDD could not have been aware of any purported protected activity. (*Id.* at 15.)

With respect to whether Plaintiff suffered an adverse action, Defendants argue that her role as the primary eyewitness to the events that were the subject of OPWDD's internal investigations does not constitute an adverse action under well-established Second Circuit precedent. (*Id.* at 18.) Furthermore, Defendants argue that the fact that Plaintiff was placed on paid administrative leave does not constitute an adverse employment action because it was (a) a non-punitive measure, (b) Plaintiff maintained full pay and benefits when she was placed on leave, and (c) placing Plaintiff on leave was justified in order to (i) cordon her off from other employees potentially involved in the incident during the pendency of the investigation in order to maintain the purity of the evidence, and (ii) protect her from retaliation. (*Id.* at 18-19.) Similarly, Defendants argue that Plaintiff's re-assignment to a different OPWDD facility cannot

be considered an adverse action because it was done to (a) maintain Plaintiff as an unbiased witness, and (b) protect her from potential negative interactions with other DAs at O.D. Heck who were either involved in or potentially loyal to the staff members under investigation. (*Id.* at 19-20.) Plaintiff was given a choice of transfer facilities and she does not claim that she lost salary, benefits, or prestige by being re-located. (*Id.* at 20.)

With respect to whether there was a causal connection between the alleged adverse action and protected activity, Defendants argue that Plaintiff has not pled, and the record does not establish, any direct retaliatory animus between her and Defendants. (*Id.* at 23.) In addition, Defendants argue that Plaintiff cannot rely on temporal proximity because the passage of time between her alleged engagement in protected activity (i.e., on October 20, 2010, when she first spoke to Investigator Murray) and the alleged adverse employment action (i.e., on March 3, 2011, when her leave was converted to unauthorized pay without leave) is greater than two months. (*Id.*)

In any event, Defendants argue that, for the foregoing reasons, they had legitimate non-retaliatory reasons for the actions that they took, namely that their actions were dictated by, and in accordance with, well-established policy. (*Id.* at 23-25.)

Third, Defendants argue that Plaintiff's NYSHRL § 296(6) claim against Defendants Diana Ritter, Max Chmura, and David Slingerland should be dismissed because they did not actually participate in the alleged retaliatory conduct and Plaintiff cannot rely on a theory of supervisory liability in order to maintain this claim against them. (*Id.* at 25-26.)

Fourth, and finally, Defendants argue that they are entitled to qualified immunity because their alleged actions were lawful, objectively reasonable, and did not violate any constitutionally

protected rights.  (*Id.* at 27.)  Specifically, Defendants argue that, upon receiving reports of abuse from Sharon Feldman, OPWDD was legally obligated to undertake an immediate and thorough investigation.  (*Id.*)  Moreover, Defendants argue that the steps they took in conducting the investigation were in furtherance of their obligation and in accordance with established agency policy.  (*Id.*)  Similarly, Defendants argue that, because the conversion of Plaintiff's leave to unauthorized leave without pay was taken pursuant to agency and Civil Service policy, their actions were objectively reasonable. (*Id.*)

### 2.      Plaintiff's Opposition Memorandum of Law

Generally, Plaintiff makes the following three arguments in opposition to Defendants' motion.  (Dkt. No. 91 [Pl.'s Opp'n Mem. of Law].)

First, Plaintiff argues that her claims are timely under the continuing-violation doctrine because her allegations form a course of continuing abuse and harassment that created a hostile work environment, which included Defendants' demand that she return to work by March 3, 2011, or her leave would be converted to unauthorized leave without pay.  (*Id.* at 4-5.)  Plaintiff argues that Defendants' refusal to correct the hostile work environment, as well as their refusal to withdraw their demand that she return to work, amounted to a constructive discharge and culminated in her forced resignation on March 15, 2011.  (*Id.* at 5-6.)  Plaintiff argues that the date of her resignation occurred within the applicable statute of limitations time period and that courts in this Circuit regularly utilize the date of resignation as the accrual date for claims of constructive discharge.  (*Id.* at 6.)

Furthermore, with respect to Defendant's argument that Plaintiff cannot rely on the date that her medical benefits were suspended (i.e., March 3, 2011), Plaintiff argues that Defendants'

demand that she return to work violated OPWDD policy because OPWDD was on notice that she was absent from work due to a work-related injury and OPWDD failed to report her injury as required by N.Y. Workers' Comp. Law § 110 or advise her that she was potentially eligible for workers' compensation benefits. (*Id.*)

Second, with respect to her retaliation claims, Plaintiff argues that she engaged in protected activity when she reported the abuse of consumers. (*Id.* at 7.) Plaintiff argues that, although she did not report the abuse immediately, this was only because she was (a) "terrified to come forward and say anything," and (b) told to "shut up" by supervisors when she inquired about possible abuse and was advised to keep her "eyes open and mouth shut." (*Id.*) Furthermore, Plaintiff argues that her actions in reporting the abuse constitute protected activity under *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271 (2009), in which it was held that Title VII's anti-retaliation provision applies to employees who voluntarily cooperate with an employer's internal investigations. (*Id.* at 8.) Plaintiff argues that Defendants' reliance on *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015), is misplaced because, although it was part of her job responsibilities to report abuse, she complained and was critical about the "discriminatory employment practices" of her employer, which constitutes protected activity under *Littlejohn*. (*Id.*)

With respect to whether OPWDD was aware of Plaintiff's protected activities, Plaintiff argues that, because her actions in complaining about the abuse of consumers to OPWDD is protected, Defendants were aware of her protected activity. (*Id.*)

With respect to whether Plaintiff suffered an adverse action, she argues that the following actions she endured are sufficiently adverse for purposes of proving her retaliation claims: (1)

being subjected to intrusive interviews/interrogations; (2) being placed on administrative leave; (3) being transferred to another facility; (4) being deprived of workers' compensation benefits; (5) losing her health insurance benefits; and (6) being forced to resign. (*Id.* at 8-9.) Furthermore, Plaintiff argues that the standard for an "adverse action" under Title VII's anti-retaliation provision is less demanding than is the standard for an "adverse employment action" under its anti-discrimination provision. (*Id.* at 9.) Plaintiff argues that, under the former standard, she must prove that the alleged acts of retaliation would dissuade a reasonable employee in her position from complaining of unlawful discrimination in the workplace. (*Id.*) However, contrary to Defendants' arguments, Plaintiff argues that this standard does not require an employee to show that an adverse action negatively affected his/her pay, training opportunities, or any other term or condition of employment. (*Id.* at 10.)

With respect to whether there is a causal relationship between Plaintiff's protected activities and the alleged adverse actions taken against her, she argues that, in December of 2010, she performed a video re-enactment of the abuse she witnessed as requested by Defendants, and then on January 5, 2011, she was threatened with, and ultimately subjected to, an interrogation. (*Id.* at 11.) Plaintiff argues that the temporal proximity between these two events is less than a month and is sufficient to satisfy her *de minimis* burden. (*Id.*)

In addition, Plaintiff argues that evidence of disparate treatment can suffice to prove this element of her claim. (*Id.* at 12.) Accordingly, Plaintiff argues that she was subjected to disparate treatment when she was forced to transfer to a different facility, which added thirty minutes to her commute as compared to the length of time it took her to travel to O.D. Heck, while the employees she accused of abuse were allowed to return to O.D. Heck. (*Id.*) Plaintiff

argues that Defendants also exhibited a retaliatory animus towards her. (*Id.*) For example, Plaintiff argues that Defendants needlessly suspended her medical benefits because they had notice that her absence from work was due to a work-related injury, yet they failed to advise her that she was eligible for workers' compensation benefits and failed to report her injury to the N.Y. Workers' Compensation Board. (*Id.*)

With respect to pretext, Plaintiff argues that Defendants' reasons for converting her leave to unauthorized leave without pay are pretextual because, despite informing OPWDD that her work-related injury was partly due to stress based on how she was being treated, no one informed her that she might have been eligible for workers' compensation benefits. (*Id.* at 14.) Similarly, Plaintiff once again argues that there is no evidence that OPWDD reported her injury to the N.Y. Workers' Compensation Board as required by N.Y. Workers' Comp. Law § 110. (*Id.*) Plaintiff argues that these failures demonstrate Defendants' true motivation for their actions, i.e., that they were not motivated by adhering to policy but by a calculated effort to intimidate and retaliate against her for her protected activities. (*Id.*)

Third, and finally, Plaintiff argues that Defendants are not entitled to qualified immunity because there is a genuine dispute of material fact regarding their retaliatory intent and whether their actions were objectively reasonable. (*Id.* at 15.)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants assert four arguments. (Dkt. No. 95 [Defs.' Reply Mem. of Law].)

First, Defendants argue that Plaintiff has failed to create a genuine dispute of material fact regarding the timeliness of her claims. (*Id.* at 3-4.) Specifically, Defendants argue that

Plaintiff has failed to point to any record evidence rebutting their assertion that her conversion to unauthorized and unpaid leave was due to established OPWDD policy as well as her failure to submit the requested written medical certification and the exhaustion of her accruals while on voluntary leave. (*Id.*) Similarly, Defendants argue that Plaintiff's claim that her conversion was due to a retaliatory animus is not supported by the record, which establishes that her leave was converted to unpaid leave due to OPWDD policy. (*Id.* at 4.)

With respect to Plaintiff's argument that the accrual date for her claims should be measured from the date on which she was constructively discharged (i.e., March 15, 2011), Defendants argue that, pursuant to this Court's prior ruling, it is now the law of the case that the "only act that occurred inside the limitations period was OPWDD's alleged failure between February 27, 2011, and March 3, 2011, to withdraw [its] demand that Plaintiff return to work, or have to begin paying for medical coverage that OPWDD afforded her pursuant to her employment." (*Id.* at 4-5 n.1.)

With respect to Plaintiff's workers' compensation claim, Defendants argue that the claim should be disregarded for the following three reasons: (1) Plaintiff asserted this claim for the very first time in her opposition memorandum of law in an eleventh-hour attempt to defeat Defendants' motion for summary judgment; (2) Plaintiff's claimed "injury" does not meet the definition for "personal injury" or "occupational disease" under N.Y. Workers' Comp. Law § 110(2) because that section specifically states that the "terms injury and personal injury shall not include any injury which is solely mental and is based on work related stress if such mental injury is a direct consequence of a lawful personnel decision"; and (3) Plaintiff's medical documentation did not definitively link any injury to the workplace. (*Id.* at 5-7.)

Second, with respect to whether Plaintiff engaged in protected activity, Defendants argue that Plaintiff's reliance on *Crawford* is misplaced because that case does not address situations in which an employee is required by law to report wrongdoing to his/her employer. (*Id.* at 8.) Defendants argue that, in *Littlejohn*, the Second Circuit specifically addressed the applicability of *Crawford* to situations in which there is an employment obligation to report wrongdoing by stating that, "consistent with *Crawford*[,] . . . we hold as follows: To the extent an employee is required as part of her job duties to report . . . such reporting . . . by itself is not protected activity." (*Id.* at 8-9.) Accordingly, Defendants argue that, as a mandated reporter, Plaintiff had an obligation to immediately report any abuse that she became aware of and that her delayed cooperation with an on-going investigation cannot be considered protected activity. (*Id.* at 8.)

Third, Defendants argue that Plaintiff has failed to oppose their arguments regarding the dismissal of her NYSHRL § 296(6) claim against Defendants Ritter, Slingerland, and Chmura. (*Id.* at 9.) Defendants argue that, because this is the only claim remaining against these individual Defendants in their personal capacities, and because Plaintiff has not opposed dismissal of this claim against them, they should be dismissed from this suit. (*Id.*)

Fourth, and finally, Defendants argue that the Court should disregard exhibits consisting of various articles and op-eds, as well as a video, published by *The New York Times* and submitted by Plaintiff. (*Id.*) Defendants argue that these exhibits do not have any evidentiary value and could not have informed any decision at issue in this matter because they were created after Plaintiff's resignation from OPWDD. (*Id.*) Furthermore, Defendants argue that the exhibits were submitted through an attorney affirmation without certification or authentication. (*Id.* at 9 n.2) Defendants argue that, pursuant to N.D.N.Y. L.R. 7.1(a)(3), attorney affidavits are not part of the record for purposes of a motion for summary judgment. (*Id.*)

## II.    LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[46]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an

---

[46]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

independent review of the record to find proof of a factual dispute.[47]  Of course, when a non-movant fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has failed to properly respond to that statement,[48]

Similarly, in this District, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[49]  Stated another way, when a non-movant fails to oppose a legal argument asserted by

_____

[47]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[48]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L.R. 7.1(a)(3).

[49]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

a movant, the movant may succeed on the argument by showing that the argument possess facial

merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R.

7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the

moving party has met its burden to demonstrate entitlement to the relief requested therein . . . .");

*Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009)

(Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 &

n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

The first question that the Court must address is whether Plaintiff's claims are barred by

the applicable statute of limitations.  After carefully considering the matter, the Court answers

this question in the affirmative for the reasons stated by Defendants in their memoranda of law.

(Dkt. No. 84, Attach. 2, at 5-11 [Defs.' Mem of Law]; Dkt. No. 95, at 3-7 [Defs.' Reply Mem. of

Law].)  To those reasons, the Court adds the following analysis.

As an initial matter, the Court notes that, because the legal standard governing the

continuing-violation doctrine as it relates to the statute of limitations was stated in this Court's

previous Decision and Order, the Court will not recite that standard here.  Instead, the Court

respectfully refers the reader to the relevant portion of its analysis in its previous Decision and

Order.  (Dkt. No. 32, at 18-19 [Decision and Order dated September 30, 2015].)[50]  In addition, as

Defendants correctly state, the Court previously held that the limitations period for Plaintiff's

claims ran from February 27, 2011, to February 27, 2014, and found that, according to Plaintiff's

---

[50]        Page citations refer to the page numbers used on CM/ECF rather than the actual
page numbers contained in the Court's Decision and Order.

own factual allegations, "[t]he only act that occurred inside the limitations period . . . was the OPWDD's alleged failure, between February 27, 2011, and March 3, 2011, to withdraw the OPWDD's demand that Plaintiff return to work on March 3, 2011, or have to begin paying for the medical coverage that the OPWDD afford her pursuant to her employment with OPWDD." (*Id.* at 20.)

Because Plaintiff now argues that there are two discrete acts that occurred within this limitations period that can be utilized as accrual dates for her claims (i.e., the date that OPWDD failed to withdraw its demand on March 3, 2011, and the date of Plaintiff's resignation on March 15, 2011), the Court finds it is necessary to discuss its previous ruling that there was only one such act. Plaintiff first argued that she was constructively discharged and forced to resign on *March 3, 2011*, not March 15, 2011. (Dkt. No. 13, Attach. 1, at 5 [Pl.'s Opp'n Mem. of Law to Defs.' Mtn. to Dismiss] [arguing that the "course of conduct continued, and culminated in the constructive discharge of the Plaintiff on March 3, 2011" and that "Plaintiff alleges she was constructively terminated. The accrual of such claims is measured from the date of the Plaintiff's resignation which was March 3, 2011"].) However, Plaintiff now argues that the accrual date of her claims was March 15, 2011.

It is well established that a constructive discharge claim accrues when an employee gives notice of his or her resignation. *Green v. Brennan*, 136 S.Ct. 1769, 1782 (2016). Despite being aware of this point of law, Plaintiff filed an Amended Complaint again alleging that she was "constructively discharged and wrongfully terminated from her position on or about March 3, 2011." (Dkt. No. 34, ¶ 23 [Pl.'s Am. Compl.].) Accordingly, in its previous Decision and Order, the Court used March 3, 2011, as the date on which Plaintiff was allegedly constructively

discharged (after OPWDD converted her medical leave to unauthorized leave without pay).  In any event, even if the Court were to use March 15, 2011, as the accrual date for Plaintiff's claims, the Court's analysis would remain the same: regardless of whether Plaintiff's resignation occurred on March 3, 2011, or March 15, 2011, the resignation was still caused by a policy and not a retaliatory act.  The Court now turns to its analysis of the timeliness of Plaintiff's claims.

Defendants have submitted admissible record evidence demonstrating that the conversion of Plaintiff's medical leave to unauthorized leave without pay was done for legitimate, non-retaliatory reasons: namely, that it was done pursuant to established OPWDD and Civil Service policy.  (Dkt. No. 84, Attach. 8, at 31-33, 45 [Exs. 13 & 16 to Coleman Decl.].)  Furthermore, Defendants have submitted admissible record evidence establishing that they mailed Plaintiff several notices and left her telephone messages advising her that she was required to submit updated medical certifications in order to extend her leave or risk having her leave converted to unauthorized leave.  (*Id.* at 7, 14, 16-17, 19, 26, 28.)  Plaintiff does not dispute that she failed to submit the requested medical certifications to extend her medical leave beyond February 17, 2011.  However, Plaintiff disputes whether she was "previously notified" by OPWDD of this requirement by citing her deposition testimony where she testified that she "does not recall receiving 'anything specific'" from OPWDD, but "does recall being notified she no longer had health insurance for her and her son." (*See generally* Dkt. No. 90, ¶¶ 108, 111-15, 117, 124-25 [Pl.'s Rule 7.1 Response].)  Plaintiff's failure to recall receiving "anything specific" is insufficient to create a genuine dispute of material fact regarding whether she was aware of her obligation to submit updated medical certifications and/or whether she did in fact receive the notices and telephone messages from OPWDD, especially in light of the record evidence

submitted by Defendants establishing those facts.  *See Brown v. St. Paul Travelers Cos., Inc.*, 331 F. App'x 68, 70 (2d Cir. 2009) ("We agree with the District Court that '[p]laintiff's statement, that she has no recollection or record of receiving the employee handbook and arbitration policy, despite the fact that it was distributed on at least six occasions during her employment, is . . . not sufficient to raise a genuine issue of material fact."); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) (stating that "vague denials and memory lapses . . . do not create genuine issues of material fact"); *Fed. Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute.  The district court was entitled to treat these facts as established for purposes of summary judgment."); *Creighton v. City of New York*, 12-CV-7454, 2017 WL 636415, at *40 (S.D.N.Y. Feb. 14, 2017) ("No issue of fact exists where, as here, one witness has a recollection of an event, while another actor in the same event has no recollection, 'one way or the other.'"); *Ferrie v. DirecTV, LLC*, 15-CV-0409, 2016 WL 183474, at *5 (D. Conn. Jan. 12, 2016) ("Ferrie argues that, 'I do not recall ever receiving and I certainly did not read the emails that DirecTV attached to its motion.' . . . However, given that DIRECTV has introduced evidence indicating that Ferrie received the e-mails, Ferrie cannot create a genuine issue of material fact as to whether he received them solely by asserting that he does not 'recall' receiving them."); *Auricchio v. Town of DeWitt*, 10-CV-1072, 2013 WL 868261, at *6, n.71 (N.D.N.Y. March 7, 2013) (Suddaby, J.) ("Despite Plaintiff's argument to the contrary, his testimony that '[t]o the best of [his] [recollection]' he does not 'believe' he said 'liar' is insufficient to create a genuine dispute of material fact on the issue, especially given that he clarified that '[he does not] recall specifically' and that '[he does not] recall the exact words at

that point."); *Craig v. Colonial Penn Ins. Co.*, 335 F. Supp. 2d 296, 305 (D. Conn. 2004) ("[A] witness's non-denial does not create a genuine issue of material fact when the witness has testified to a lack of memory and no affirmative evidence has been introduced.").  Indeed, Plaintiff submitted three updated medical certifications in order to extend her medical leave until February 17, 2011.[51]  (Dkt. No. 84, Attach. 8, at 9, 12, 21-22 [Exs. 4, 5, and 9 to Coleman Decl.].)  Therefore, she must have been aware of this obligation.

In an effort to raise a genuine dispute of material fact regarding whether the conversion of her leave was appropriate pursuant to established policy, Plaintiff argues, for the first time, that OPWDD was on notice that she was on leave due to a work-related injury and, therefore, had an obligation, pursuant to N.Y. Workers' Comp. Law § 110, to report her injury to the N.Y. Workers' Compensation Board as well as inform her of her potential eligibility for workers' compensation benefits.  The Court agrees with Defendants, for the reasons stated in their reply memorandum of law, that this argument must be disregarded and/or lacks merit.  (Dkt. No. 95, at 5-7 [Defs.' Reply Mem. of Law].)

More specifically, in addition to the fact that Plaintiff has raised this claim for the first time in her opposition memorandum of law, it is apparent that Defendants did not have adequate notice that Plaintiff suffered a work-related injury.  Indeed, as Defendants point out, of the three medical documents Plaintiff provided to OPWDD, none of them definitively link any injury to the workplace.  (*Id.* at 7.)  In response to the question "is this absence caused by a work related injury?" Plaintiff's first medical certification states "No/Yes – Partly."  (Dkt. No. 84, Attach. 8,

---

[51]     Defendants argue that Plaintiff did not timely submit these medical certifications and, therefore, there were gaps of time between each submission where Plaintiff's absence from work was not excused.  (Dkt. No. 84, Attach. 2, at 8 n.11 [Defs.' Mem. of Law].)

at 9 [Ex. 4 to Coleman Decl.].)  Plaintiff's second medical certification provides no information regarding either the purported injury or its relation to the workplace.  (Dkt. No. 84, Attach. 8, at 12 [Ex. 5 to Coleman Decl.].)  Finally, in response to the question "is this absence caused by a work related injury?" Plaintiff's third medical certification states "unknown–no specific injury." (Dkt. No. 84, Attach. 8, at 22 [Ex. 9 to Coleman Decl.].)  New York courts have held that an employer must be on notice, or have knowledge, of a work-related injury in order to trigger the obligation, under N.Y. Workers' Comp. Law § 110, to report the injury to the Workers' Compensation Board.  *See*, *e.g.*, *Roman v. Leviton Mfg. Co., Inc.*, 285 A.D. 918 (N.Y. App. Div. 3d Dep't 1955) ("The record does not . . . require a finding by the Board that the employer actually had such knowledge of the X-ray interpretation to impose a duty under Workmen's Compensation Law, § 110, to notify all interested parties and report to the Board.").

In any event, even if OPWDD did have notice of a work-related injury, a claim that OPWDD violated the N.Y. Workers' Compensation Law by failing to report Plaintiff's injury to the Workers' Compensation Board cannot be properly resolved by this Court.  *See Collins v. Bloomingdales Div. of Federated Dep't Stores, Inc.*, 06-CV-7202, 2007 WL 1522617, at *2 (S.D.N.Y. May 22, 2007) ("To the extent that plaintiff's complaint alleges a failure to file workman's compensation claims on her behalf, claims of that nature must be brought before the Workers' Compensation Board and therefore, to the extent they even relate to the ADA claim, are improperly before this Court and dismissed."); *Morales v. Mobil Chem.*, 222 A.D.2d 1040 (N.Y. App. Div. 4th Dep't 1995) ("Plaintiff alleged a breach of an implied contract against her employer based upon her employer's alleged failure to file a contemporaneous report of her on-the-job injury. Because the filing of an injury report is conduct regulated by the Workers' Compensation Law . . . , it 'is subject to the protection of that law's exclusivity.'").

Accordingly, for all of the foregoing reasons, the Court finds that Plaintiff has failed to raise a genuine dispute of material fact regarding whether she suffered any retaliatory acts and/or was constructively discharged within the applicable statute of limitations time frame. Therefore, Plaintiff cannot avail herself of the continuing-violation doctrine and her claims must be dismissed as time-barred. Because this constitutes an adequate ground on which to base a dismissal of Plaintiff's claims, the Court need not, and does not, address the other issues raised by Defendants' motion.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 84) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 34) is **DISMISSED**.

The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

Dated: September 27, 2017
          Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge